**FORT WORTH INDEPENDENT SCHOOL DISTRICT, Petitioner,**

v.

**CITY OF FORT WORTH and Southwestern Bell Telephone Company, Respondents.**

No. 98–1138.

Supreme Court of Texas.

Argued Nov. 3, 1999.

Decided May 11, 2000.

Rehearing Overruled Aug. 24, 2000.

Terrell W. Oxford, Dallas, W. Kelly Puls, Fort Worth, Kenneth E. Gardner, Dallas, Martha Evans, Dallas, Jeffrey W. Chambers, Fort Worth, for Petitioner.

Dee J. Kelly, Jr., Wade Adkins, Fort Worth, Robert E. Davis, Dallas, E. Glen Johnson, Roger Clyfton Diseker, Theodore P. Gorski, Fort Worth, Donna Lynn Snyder, Derek Shane Hollingsworth, David Randall Johnson, Suzanne C. Leslie, David J. Schenck, Dallas, for Respondents.

Justice HECHT delivered the opinion of the Court.

From 1937 to 1992, a Fort Worth city ordinance required Southwestern Bell Telephone Co. to pay the City, "in lieu of" all charges, fees, and taxes owed for its location of poles, wires, and other facilities on city property, a percentage of its gross receipts from the rendition of local service. A separate ordinance provided that the City would apportion Bell's payments between itself and the Fort Worth Independent School District. The School District sued the City and Bell for breach of their obligations under these ordinances and for the City's breach of a separate agreement to continue the same arrangement after 1992. The district court granted summary judgment for the City and Bell, and the court of appeals affirmed.[1] The principal issue before us is whether the city ordinances and the related, contemporaneously executed documents constituted a valid agreement enforceable by the School District against the City and Bell. We hold that the City and Bell have failed to establish conclusively:

- that no agreement existed whereby the City waived immunity from liability;
- that the City's obligations to the School District lacked consideration; or
- that the parties' arrangement violated:
  - the prohibitions in the City's charter against obligations for future expendi-

1. —— S.W.3d ——.

tures without adequate reserves, and franchises for more than 25 years;

- the prohibitions in article I, sections 17 and 26 of the Texas Constitution against irrevocable and perpetual grants;
- the provisions of article III, sections 51 and 52 of the Texas Constitution that prohibit a city from granting public money to any other entity;
- the requirements of article VIII, section 1(a) and (b) of the Texas Constitution that taxes be equal and uniform, and that property be taxed in proportion to its value; or
- the requirement of article VIII, section 18(b) of the Texas Constitution that after January 1, 1982, all property in a county have a single appraisal.

We also hold, however, that the City has established as a matter of law that it had no obligation to continue its arrangement with the School District after 1992. Accordingly, we affirm the court of appeals' judgment in part, reverse it in part, and remand the case to the district court for further proceedings.

## I

The City of Fort Worth and the Fort Worth Independent School District are each empowered to tax real property locat-ed within their respective borders.[2] The City may also impose fees and charges for its services.[3] When the School District was first created in 1925, its territorial limits were substantially the same as the City's,[4] and its taxes were assessed and collected by the City's tax assessor-collector, who paid them over to the board of education.[5]

In 1927, the City claimed that the right it had previously given Southwestern Bell Telephone Co. to use public streets, alleys, and rights-of-way to place poles and run wires for its telephone system was an easement, and for the first time the City assessed an ad valorem tax on that right. The next year, Bell sued the City and the School District in federal court, claiming that the tax was unlawful. After eight years of bitterly contested litigation, the United States Court of Appeals for the Fifth Circuit held in 1936 that Bell's right to use public property was a taxable property interest.[6]

As hard as it had been for the City and School District to establish their legal right to tax Bell's easement, the practical problems of appraising that unique property interest posed an even more difficult challenge. The Fifth Circuit had warned that Bell's interest could not be "valued on any strained or artificial basis."[7] After

---

**2.** Tex. Const. art. VII, § 3 (authorizing school districts to assess and collect taxes), art. XI, § 5 (authorizing cities with a population of more than 5,000 to levy, assess, and collect taxes); Tex. Educ.Code § 11.152 (authorizing the board of trustees of an independent school district to levy and collect taxes); Tex. Tax Code § 302.001(c) (authorizing a home-rule city to levy property taxes); Act of March 16, 1925, 39th Leg., R.S., ch. 230, § 24, 1925 Tex. Loc. & Spec. Laws 674, 694 (creating the Fort Worth Independent School District and authorizing it to levy and collect taxes).

**3.** See Tex.Rev.Civ. Stat. Ann. art. 1175, § 1 (establishing that home-rule municipalities have the power to "determine, fix and regulate the charges, fares or rates of any person, firm or corporation enjoying or that may enjoy the franchise or exercising any other public privilege in said city"); Charter, City of Fort Worth, Texas, ch. II, § 1 (authorizing the

City's broad police powers), ch. XXVI, § 1 (granting the city council the power to regulate and fix the rates, tolls, and charges of all public utilities in the city). We note that the Legislature recently codified legislation regulating municipal franchises for telecommunications services. See Tex. Local Gov't Code §§ 283.001–.058. The common law still governs this dispute, however, because this suit pre-dates the legislation.

**4.** City of Fort Worth v. Southwestern Bell Tel. Co., 80 F.2d 972, 973 (5th Cir.1936).

**5.** Act of March 16, 1925, 39th Leg., R.S., ch. 230, § 29, 1925 Tex. Loc. & Spec. Laws 674, 696–697.

**6.** City of Fort Worth, 80 F.2d at 975–77.

**7.** Id. at 977.

the court's decision issued, Bell's lawyer wrote to the City Council that "it will be difficult to formulate a basis of valuation that will not give rise to recurring controversies each year" and that he hoped "some equitable basis might be found to settle the tax question between the city, the school district, and the telephone company amicably and thus terminate the litigation that has been in progress for several years." Bell's lawyer proposed:

We, therefore, have sought to find some other basis that will be fair to both parties, that will yield to the city and school district an equivalent of what might be reasonably expected on an ad valorem basis and avoid future controversies that might otherwise arise. It occurred to us that the gross exchange revenues of the Ft. Worth exchange could be used as a basis for such computation, applying thereto a percentage that will yield to the city and school district as much revenue as might otherwise be obtained. The gross revenue for 1935 was slightly in excess of a million five hundred thousand dollars. One and one-half percent of such gross revenue would be $22,500. If business improves and the revenue of the Ft. Worth office increases the payment to the city and school district will like wise be increased. Such a basis of calculation will automatically determine the payments to the city and school district and will prevent future controversies as to property values, etc.

\* \* \*

Of course our final agreement to the outlined arrangement would depend on our ability with the legal department of the city, to work out agreements legal and valid in all particulars and an agreement that in all respects meets with the approval of the City Manager and the City Council.

By the end of the year, the parties had negotiated a settlement. On December 23, 1936, the City passed Ordinance No.1933, which provided in pertinent part:

That from and after the effective date of this ordinance the Telephone Company shall pay to the City of Fort Worth an annual inspection fee and service charge in an amount equal to two per cent (2%) of the gross receipts for the preceding year received by the Telephone Company from the rendition of local exchange telephone transmission service within the corporate limits of the City. Said amount of two per cent (2%) of the gross receipts shall constitute compensation to the City for the expense incurred and services rendered by the City in exercising its police power of regulation and supervision over the construction and location of the Telephone Company's poles, wires, conduits, equipment and other facilities in the streets, alleys, highways and public grounds of the City. . . .

\* \* \*

During the continuance of this agreement and so long as the Telephone Company shall pay to the City the percentage of its gross receipts aforesaid, the City agrees that said payment shall be received by it in lieu of any tax, license, charge, fee, street or alley rental, or other character of charge, heretofore or hereafter levied, for use and occupancy of streets, alleys, and public places of the City; in lieu of any pole tax or charge or permit fee, in lieu of any easement or franchise tax, whether levied as an ad valorem, special, or other character of tax; and in lieu of any imposition other than the usual general or special ad valorem taxes now or hereafter levied. Should the City not have the legal power to agree that the payment of the percentage of gross receipt herein provided for shall be in lieu of the taxes, licenses, charges, fees, rentals, and easement or franchise taxes aforesaid, then the City agrees that it will apply so much of said payment of per-

centage of gross receipts, up to the amount of one and one-half percent (1½ %), as may be necessary to the satisfaction of the Telephone Company's obligations, if any, to pay such taxes, licenses, charges, fees, rentals, and easement or franchise taxes.

Bell filed with the City Secretary a formal, written acceptance of Ordinance No.1933.

One week later, on December 30, 1936, the City passed Ordinance No.1935, which stated in part:

WHEREAS, in the settlement of the controversy existing between the Southwestern Bell Telephone Company, the City of Fort Worth and the Fort Worth Independent School District with reference to the levy and collection of taxes on easements used, owned and enjoyed by said company in, over and along certain streets, alleys and public ways in said City, it is provided in Ordinance No.1933, passed and adopted by the City Council on Wednesday, the 23rd of December, 1936, that said company shall pay annually to the City of Fort Worth two per cent (2%) of the gross receipts from the rendition of local exchange telephone transmission service within the corporate limits of the said City of Fort Worth; and,

WHEREAS, it is necessary to make a proper apportionment of said taxes between the City of Fort Worth and the Fort Worth Independent School District, NOW, THEREFORE,

BE IT ORDAINED BY THIS CITY COUNCIL OF THE CITY OF FORT WORTH, TEXAS:

## SECTION 1.

That all of the funds realized from the payment of the gross receipts taxes provided for in Ordinance No.1933 ... be and the same are hereby accepted as in said Ordinance No.1933 provided, and the Commissioner of accounts and other proper officers are hereby authorized, ordered and directed to apportion said funds between the City of Fort Worth and the Fort Worth Independent School District on the same basis that all funds received as ad valorem taxes on all real, personal and mixed property in said city, and not exempt from taxation, are apportioned for the same year.

The following day the School District's Board of Education adopted a resolution that provided in pertinent part the following:

WHEREAS, a controversy exists between [the Telephone Company] on the one hand; [the City and School District] on the other hand, concerning the right and power of the City and the School District to levy and collect taxes on the so-called easement rights of the Telephone Company growing out of its use and occupancy of certain of the streets, alleys and high-ways in said City and said School District, arising out of which said controversy a suit is pending ...; and

WHEREAS, said controversy has been compromised and settled, as evidenced by [Ordinance No.1933]; and

WHEREAS, it is understood and agreed by the City Council and officials of said City and the Board of Education of said School District that said compromise and settlement is subject to the approval of said Board of Education, and that the said School District is entitled to share with the City in said annual payment of 2% to be made by the Telephone Company; and

WHEREAS, it has been agreed by and between the officials and the Council of the said City and the Board of Education of said School District that the moneys paid by the Telephone Company under said ordinance should and shall be apportioned and divided between the [City] and the [School District] on the same basis that all funds received as ad valorem taxes on all real, personal and mixed property in said City and not exempt from taxation are divided and apportioned for the same

year, in accordance with [Ordinance No.1935];

* * *

NOW, THEREFORE, be it resolved ... that the said settlement and compromise of the said controversy on the terms set out and contained in the said ordinances ... is hereby in all things approved and shall constitute a complete settlement of the said controversy between the Telephone Company and the said School District.

And be it further resolved that all sums paid by the Telephone Company under said ordinance No.1933 shall be apportioned and divided between [the City and School District] on the same basis that all funds received as ad valorem taxes on all real, personal and mixed property in said City and not exempt from taxation are divided and apportioned for the same year, in accordance with [Ordinance No.1935].

And be it further resolved that should said School District and said Board of Education not have the legal power to agree that the payment of percentage of gross receipts provided to be paid under the terms of said ordinance in lieu of the taxes and charges enumerated in said ordinance, then and in that event, the said School District shall and will apply so much of said payment of percentage of gross receipts, up to the amount of such payment as shall have been received by the said School District, as may be necessary to the satisfaction of the Telephone Company's obligations, if any, to said School District, to pay any taxes, licenses, charges and fees on account of its use and occupancy of any streets, alleys, highways or public grounds within said School District.

Several days later, on January 6, 1937, Bell formally executed a written acceptance of "the terms of said resolution" as

"approving the settlement and compromise" of the pending litigation.

From 1937 until 1992 Bell made payments to the City under Ordinance No.1933, and the City apportioned part of those payments to the School District under Ordinance No.1935. The arrangement continued despite two significant changes in the law. In 1945, the Legislature implicitly repealed the 1925 law requiring the City's tax assessor-collector to act for the School District.[8] Then, effective January 1, 1982, provisions of the Texas Property Tax Code enacted in compliance with article VIII, section 18 of the Texas Constitution required that a single appraisal be made of all taxable property in a county.[9]

In 1991, the City and Bell, without the School District, began negotiating a new agreement, although in March 1992 the city manager wrote to the School District: "If the City should negotiate a new agreement with the telephone company, we commit the City to arriving at an appropriate arrangement with the [School District] to share in that revenue." Not quite six months later the City apparently concluded that the "appropriate arrangement" was to exclude the School District. On September 1, 1992, the City enacted Ordinance No. 11163, which expressly repealed Ordinance No.1933 and replaced it with the following new gross receipts payment agreement between Bell and the City:

As compensation for the use, occupancy, oversight, supervision and regulation of the City's rights-of-way, and in lieu of and in full compensation for any lawful tax or license or charge or right-of-way permit fee or inspection fee, whether charged to the Telephone Company or its contractor(s), or any right-of-way easement or street or alley rental or corporate franchise tax or other character of charge for use and occupancy of the rights-of-way within the City, except the usual general ad valorem taxes, spe-

8. Act of Mar. 28, 1945, 49th Leg., R.S., ch. 64, § 2, 1945 Tex. Gen. Laws 92.

9. Act of May 26, 1979, 66th Leg., R.S., ch. 841, § 3, 1979 Tex. Gen. Laws 2217, 2313.

cial assessments in accordance with state law or sales taxes now or hereafter levied by the City in accordance with state law, the City hereby imposes an annual charge of $5,340,000 ... upon the gross receipts ... of the Telephone Company [subject to adjustment].

No one disputes in this Court that Ordinance No. 11163 also implicitly repealed Ordinance No.1935. Once Ordinance No. 11163 took effect on October 1, 1992, the City ceased allotting to the School District any of Bell's annual payment.

The School District then brought this lawsuit against the City and Bell, asserting four claims:

- Bell failed to fully comply with Ordinance No.1933 because it excluded certain revenue from its gross receipts calculation, resulting in lower payments to the City and hence to the School District;

- the City violated Ordinance No.1935 by failing to monitor Bell's payments to ensure that it was complying with Ordinance No.1933;

- the City violated Ordinance No.1935 by withholding from the School District its portion of additional payments Bell made to the City since 1966; and

- the City Manager's March 1992 letter constituted an agreement not to exclude the School District from sharing in any renegotiated arrangement with Bell, which the City breached by passing Ordinance No. 11163.

The City moved for summary judgment on the following grounds:

- the City is immune from liability to the School District, and the City made no settlement agreement that waived immunity;

- Ordinance No.1935 obligated the City to make future payments to the School District, and the City charter prohibits such obligations;

- Ordinance No.1933 was an irrevocable and perpetual grant in violation of the

City charter and article I, sections 17 and 26 of the Texas Constitution;

- Ordinance No.1935 obligated the City to donate public funds to the School District in violation of article III, sections 51 and 52 of the Texas Constitution;

- the School District received all payments it was due;

- the City did not agree in March 1992 to continue the arrangement with the School District; and

- the City is immune to the School District's failure-to-monitor claim because it arises out of the City's exercise of its taxing authority.

Bell also moved for summary judgment, urging the following grounds:

- Ordinance No.1933 violated the requirement of article VIII, section 1(a) of the Texas Constitution that requires taxation to be "equal and uniform";

- Ordinance No.1933 violated the requirement of article VIII, section 1(b) of the Texas Constitution that requires property to be taxed "in proportion to its value";

- the School District had no authority to impose any fee, tax, or other obligation on Bell except ad valorem taxes, which it imposed through an unlawful arrangement; and

- after January 1, 1982, Ordinance No.1933 was unlawful because only the Tarrant County Appraisal District could appraise its property for taxes.

The School District did not move for summary judgment.

The trial court granted the City's and Bell's motions without stating the grounds, and the School District appealed. The court of appeals affirmed.[10]

## II

Several of the City's grounds for summary judgment relate to its immunity argument, so we begin there. The City

10. —— S.W.3d ——.

claims only immunity from liability, not immunity from suit.[11] The School District does not dispute that cities enjoy immunity from liability for governmental actions,[12] but it argues that the City waived immunity from liability in this case by entering into a settlement agreement with the School District and Bell in 1936. The City does not dispute that a governmental entity may waive immunity by entering into a contract,[13] but it argues that it made no such contract in 1936. Even if it did, the City argues that any obligation it owed the School District lacked consideration, and that the agreement was unlawful for several reasons. We examine each of these arguments in turn.

## A

■ The City argues that it did not contract with the School District in 1936 because no single instrument reflects any agreement. Ordinance No.1935, the City argues, was a unilateral action on its part in which no waiver of immunity can be found or implied. The City's argument ignores well-established law that instruments pertaining to the same transaction may be read together to ascertain the parties' intent,[14] even if the parties executed the instruments at different times and the instruments do not expressly refer to each other,[15] and that a court may determine, as a matter of law, that multiple documents comprise a written contract.[16] In appropriate instances, courts may con-

strue all the documents as if they were part of a single, unified instrument.[17]

The record proves irrefragably that the City and the School District entered into a settlement agreement with Bell in 1936. Bell's lawyer proposed such an agreement. Ordinance No.1935 referred to "the settlement of the controversy existing between" the City, the School District, and Bell. The School District's resolution accepting Ordinance No.1935 stated that the "said controversy has been compromised and settled, as evidenced by [Ordinance No.1933]." Bell accepted "the terms of the resolution", describing it as approving the settlement and compromise of the federal suit between the parties. The two ordinances and the contemporaneous, related documents comprise the parties' agreement.

■ A governmental entity protected by immunity is liable on contracts it makes for its benefit as if it were a private person.[18] Nothing in the 1936 arrangement suggests that the parties did not fully expect to enforce, if necessary, the obligations each undertook in settlement of their dispute. We therefore think it clear that the City has not proved that it made no agreement with the School District and Bell by which it waived immunity from liability.

## B

■ The City argues that any agreement it made with the School District is

11. See *Federal Sign v. Texas So. Univ.*, 951 S.W.2d 401, 405 (Tex.1997).

12. *City of LaPorte v. Barfield*, 898 S.W.2d 288, 291 (Tex.1995); *City of Galveston v. Posnainsky*, 62 Tex. 118, 127 (1884) (explaining that a city is deemed an agent of the state for sovereign immunity purposes when exercising its powers for a public purpose).

13. *Federal Sign*, 951 S.W.2d at 405.

14. *Jim Walter Homes, Inc. v. Schuenemann*, 668 S.W.2d 324, 327 (Tex.1984); *Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex.1981).

15. *Board of Ins. Com'rs v. Great So. Life Ins. Co.*, 150 Tex. 258, 239 S.W.2d 803, 809 (1951).

16. *Jones*, 614 S.W.2d at 98; *Miles v. Martin*, 159 Tex. 336, 321 S.W.2d 62, 65 (1959); *Veal v. Thomason*, 138 Tex. 341, 159 S.W.2d 472, 475 (1942); *Braniff Inv. Co. v. Robertson*, 124 Tex. 524, 81 S.W.2d 45, 47 (1935).

17. See *Kansas City Life Ins. Co. v. Duvall*, 129 Tex. 287, 104 S.W.2d 11, 11 (1937) (treating two deeds of trust, plus various bonds and notes, as "the loan contract").

18. *Federal Sign*, 951 S.W.2d at 405.

unenforceable for lack of consideration and therefore cannot be a basis for waiver of immunity. A benefit to a promisor is consideration for a valid contract, as is a detriment to a promisee.[19] One benefit the City received for its promise to apportion part of Bell's payments to the School District was relief from the responsibility, as the School District's tax assessor-collector, of having to value Bell's easement, with the difficulties and endless controversies that such a valuation necessarily entailed and that the arrangement was meant to avoid. While a change in the law in 1945 apparently excused the City from serving any longer as tax assessor-collector for the School District, the consideration the parties had already received was sufficient to support their agreement, which could have been terminated by either party at will. We easily conclude that the City has not proved that its obligation to the School District under Ordinance No.1935 was unenforceable for lack of consideration.

### C

The City contends that its apportionment of Bell's annual payments to the School District under Ordinance No.1935 for over fifty years was illegal for a number of reasons, and that its obligation under that ordinance cannot therefore provide a basis for waiver of the City's immunity. We examine each of the City's arguments and conclude that none establishes its right to summary judgment.

### 1

■ The City asserts that the 1936 arrangement violated several prohibitions against extended municipal commitments. First, the City argues that Ordinance No.1935 violated its charter provisions forbidding commitments for future expenditures without establishing a sufficient reserve to fund them.[20] The City also argues that Ordinance No.1933 granted Bell a franchise for more than 25 years in violation of the City's charter. Finally, the City argues that Ordinance No.1933 was an "irrevocable or uncontrollable grant of special privileges" to Bell in violation of article I, section 17 of the Texas Constitution,[21] and a "[p]erpetuit[y] ... contrary to the genius of a free government" in violation of article I, section 26 of the Texas Constitution.[22]

All of these arguments are answered by another argument the City makes: that the agreement reflected in Ordinances Nos.1933 and 1935 was terminable at the will of any party, and that the arrangement was in fact terminated by the adoption of Ordinance No. 11163. We agree with this latter argument, which answers the others the City makes. We have previously stated that "contracts which contemplate continuing performance (or successive performances) and which are indefinite in duration can be terminated at the will of either party."[23] Nothing in the 1936 arrangement obligated any of the parties to continue with it for any length of time. Therefore, the City has not proved that it was committed to a lasting arrangement in violation of any prohibition against such things.

### 2

■ The City's most serious attack on the validity of the 1936 arrangement is that Ordinance No.1935 required it to

**19.** *Northern Natural Gas Co. v. Conoco, Inc.,* 986 S.W.2d 603, 607 (Tex.1998).

**20.** *See* CHARTER, CITY OF FORT WORTH, TEXAS, ch. X, §§ 5, 8, and 10.

**21.** TEX. CONST. art. I, § 17 ("[N]o irrevocable or uncontrollable grant of special privileges or immunities, shall be made".).

**22.** *Id.* art. I, § 26 ("Perpetuities and monopolies are contrary to the genius of a free government, and shall never be allowed, nor shall the law of primogeniture or entailments ever be in force in this State.").

**23.** *Clear Lake City Water Auth. v. Clear Lake Utils. Co.,* 549 S.W.2d 385, 390 (Tex.1977).

grant its funds to the School District in violation of article III, section 51 of the Texas Constitution, which states that "[t]he Legislature shall have no power to make any grant or authorize the making of any grant of public moneys to any individual, association of individuals, municipal or other corporations whatsoever", and section 52 of the same article, which similarly provides that with exceptions not here applicable, "the Legislature shall have no power to authorize any county, city, town or other political corporation or subdivision of the State to lend its credit or to grant public money or thing of value in aid of, or to an individual, association or corporation whatsoever". To answer this argument, we must determine whether Bell's payments under Ordinance No.1933 were solely for City services and taxes or whether they were also for School District taxes. If the former, then the City could not apportion them to the School District because they would constitute the City's "public money".

This Court's objective in construing written language is to give effect to the intent expressed in that language by the person or persons who wrote it or who agreed to be bound by it. Ordinance No.1933 required Bell to pay the City "an annual inspection fee and service charge" as:

> compensation to the City for the expense incurred and services rendered by the City in exercising its police power of regulation and supervision over the construction and location of [Bell's] poles, wires, conduits, equipment and other facilities in the streets, alleys, highways and public grounds of the City. . . .

This language strongly suggests that Bell's payments were solely for services rendered by the City and not for any taxes

owed the City or the School District. But the ordinance adds that Bell's payment is "in lieu of [all] taxes, licenses, charges, fees, rentals, and easement or franchise taxes". The phrase, "in lieu of", often means "instead of",[24] but it can also mean "as a payment . . . for".[25] One noted lexicographer has warned that for "in lieu of", "*instead of* will not always suffice in its stead".[26] Using dictionary definitions, Ordinance No.1933 could be read to mean either that Bell was to pay only a fee for City services and nothing for taxes, as the City argues, or that its payment was to be for City services as well as all taxes or other obligations due, as the School District argues. Although Bell is generally aligned with the City in this case, it sides with the School District on this issue, taking the position, understandably, that its payments under Ordinance No.1933 fully discharged its entire obligation to the City and School District.

■ To determine the parties' intent, we must look at the arrangement as a whole.[27] When we do, we find several reasons to agree with Bell and the School District. First, the percentage of gross revenues that Bell was to pay annually was proposed by its lawyer as "a basis for . . . computation" of ad valorem taxes on Bell's easement that would "avoid future controversies", not solely as a means of determining what the City's proper charges were for exercising its supervisory police power. Second, to charge Bell only a fee for services and not assess ad valorem taxes would clearly violate (as we explain in more detail below) article VIII, section 1(a) of the Texas Constitution, which requires that taxation be "equal and uniform". In short, the City could not simply forgive Bell its City taxes, let alone its School District taxes, in exchange for a payment for City services. Third, if the

---

24. WEBSTER'S THIRD NEW INT'L DICTIONARY 1306 (1981); 7 THE OXFORD ENGLISH DICTIONARY 908 (1989).

25. 7 THE OXFORD ENGLISH DICTIONARY 908 (1989).

26. BRYAN A. GARNER, A DICTIONARY OF MODERN LEGAL USAGE 449 (2d ed.1995).

27. *See Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex.1994).

City intended Bell's payments under Ordinance No.1933 to be solely for City services, there would have been no reason whatsoever for the City to then agree to apportion the payments to the School District, as it did in Ordinance No.1935. The School District had no police power and hence no right to payment for its exercise; payments to the School District could only have been for taxes. Fourth, the School District had no reason to settle its valid claim for ad valorem taxes, that had only months earlier been vindicated by the Fifth Circuit after eight years of litigation, by agreeing to an arrangement whereby Bell would pay nothing for taxes. The controversy was all about taxes, and so were the motives for settling. Fifth, Bell likewise had no reason to settle its liability for ad valorem taxes to the City and the School District by agreeing to an arrangement that satisfied only its obligation for City services. Unless its tax liability was thereby discharged, Bell accomplished nothing by way of settlement. Sixth, several court opinions published in the same era as the 1936 agreement in this case recognize the difficulty in valuing easements and franchises and note that gross income or profit is a typical method for calculating taxes on such property interests.[28] These opinions give some indication that the parties' arrangement in this case was one commonly used to determine tax liability. Finally, Bell has continued to make the same arrangement with other municipalities.[29]

We think it makes little sense to say that Ordinance No.1933 settled a tax dispute without discharging the disputed tax liability. We conclude that the City has not established that Bell's payments under Ordinance No.1933 were not in part for the School District's taxes. Since any payment for such taxes was not public money that belonged to the City but was merely collected for the School District, the City has not established that its apportionments to the School District violated article III, Sections 51 and 52 of the Texas Constitution.

**D**

For these reasons, we conclude that the City did not establish its immunity from liability to the School District.

**III**

■ Bell argues that the 1936 arrangement was an unlawful assessment of taxes. Bell's arguments, if correct, would defeat the School District's claims against both Bell and the City.

■ Bell contends that Ordinance No.1933 assessed taxes in violation of article VIII, section 1(a) of the Texas Constitution, which requires that "[t]axation shall be equal and uniform", and article VIII, section 1(b) of the Texas Constitution, which requires that property "be taxed in proportion to its value". Taxation satisfies these provisions only when a lawfully adopted, generally applicable tax rate is

---

**28.** *Texas & Pac. Ry. Co. v. City of El Paso,* 126 Tex. 86, 85 S.W.2d 245, 250–51 (1935) (suggesting that in the absence of legislation prescribing the method for valuing an easement or franchise, one factor to consider is the profit from its use); *Houston Oil Co. v. Lawson,* 175 S.W.2d 716, 723 (Tex.Civ.App.—Galveston 1943, writ ref'd). *See also City of Nassau Bay v. Nassau Bay Tel. Co.,* 517 S.W.2d 613, 617 (Tex.Civ.App.—Houston [1st Dist.]1974, writ ref'd n.r.e.) (explaining that the telephone company's easement tax is based on its gross receipts). We also note that a number of cases involve franchise agreements consisting of gross receipts payments in lieu of ad valorem taxes. *See, e.g.,*

*San Antonio Indep. Sch. Dist. v. City of San Antonio,* 550 S.W.2d 262 (Tex.1976); *City of Jacksonville v. General Tel. Co.,* 538 S.W.2d 253 (Tex.Civ.App.—Tyler 1976, writ ref'd n.r.e.); *Southwestern Bell Tel. Co. v. City of Port Arthur,* 491 S.W.2d 187 (Tex.Civ.App.—Beaumont 1973, writ ref'd n.r.e.).

**29.** Op. Tex. Att'y Gen. No. H–1265 (1978) (noting that Bell's standard franchise agreement with municipalities likely consists of a "franchise charge [that] includes a payment in lieu of ad valorem tax on the franchise assessed").

applied to the property's market value,[30] and the appraisal and assessment follow the procedures provided by law, *i.e.*, the Texas Property Tax Code.[31] Bell also contends that Ordinance No.1933 did not, after 1982, comply with article VIII, section 18(b) of the Texas Constitution, which requires "[a] single appraisal within each county of all property subject to ad valorem taxation". The statutes enabling this provision have given the county appraisal district exclusive authority to appraise all property subject to ad valorem taxes in the county.[32] Bell claims that Ordinance No.1933's special tax arrangement, whereby Bell paid a percentage of its gross receipts in lieu of all charges, fees, and taxes on its franchise and easement, without regard to market value, is contrary to these constitutional and statutory requirements. No other taxpayer in the district had a similar arrangement.

The inconsistency between these arguments and Bell's conduct for more than fifty years is obvious. Its lawyer proposed the 1936 settlement and stressed that "our final agreement to the outlined arrangement would depend on our ability with the legal department of the city, to work out agreements legal and valid in all particulars". One might suppose that the arrangement it ultimately agreed to was therefore "legal and valid in all particulars". But Bell's position here is that although it made payments under Ordinance No.1933 from 1937 to 1992, and agreed in 1992 to make similar payments under Ordinance No. 11163 for five years, it has always considered all such payments to be illegal. Bell has not explained why it voluntarily participated in conduct it considered to be illegal.

It is a fundamental rule of constitutional law that a court "will not pass upon the constitutionality of a statute at the instance of one who has availed himself of its benefits." [33] A party contractually waives its constitutional or statutory rights by intelligently, voluntarily, and knowingly relinquishing a known right or acting inconsistent with claiming that right.[34] Bell proposed and for more than half a century complied with the 1936 settlement agreement, which it could have terminated at any time, electing instead to take the benefits from the arrangement. Bell has thus waived its complaints that the 1936 arrangement was unlawful.

In addition, Bell has failed to establish that the 1936 arrangement was unlawful. The City and the School District were authorized to settle their tax dispute with Bell, which involved difficult valuation issues that were likely to be disputed for years, by agreeing to an amount that they were satisfied would approximate the tax

**30.** *See Lively v. Missouri K. & T. Ry.*, 102 Tex. 545, 120 S.W. 852, 856–857 (1909).

**31.** *Wilson v. Galveston County Cent. Appraisal Dist.*, 713 S.W.2d 98, 100 (Tex.1986).

**32.** *Id.*

**33.** *Fahey v. Mallonee*, 332 U.S. 245, 255, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947) (quoting *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)). *See Birdville Indep. Sch. Dist. v. First Baptist Church*, 788 S.W.2d 26, 30 (Tex.App.—Fort Worth 1988, writ denied); *Becton v. Dublin*, 163 S.W.2d 907, 910–11 (Tex.Civ.App.—El Paso 1942, writ ref'd w.o.m.); *see also Allen v. Employers Cas. Co.*, 888 S.W.2d 219, 222 (Tex.App.—Amarillo 1994, no writ); *Hurst v. Guadalupe County Appraisal Dist.*, 752 S.W.2d 231, 233 (Tex.App.—San Antonio 1988, no writ); *Texas Architectural Aggregate, Inc. v. Adams*, 690 S.W.2d 640, 643–44 (Tex.App.—Austin 1985, no writ) (both quoting *Ashwander* and citing *Fahey*). *Cf. Baker v. Coman*, 109 Tex. 85, 198 S.W. 141, 141 (1917) (referring to the "general rule which refuses to permit a party to question the validity of a law that is the source of the right he claims").

**34.** *See Williams v. Williams*, 569 S.W.2d 867, 870 (Tex.1978) (finding contractual waiver of a surviving spouse's constitutional and statutory rights to a homestead and other exempt property); *Dillee v. Sisters of Charity*, 912 S.W.2d 307, 309 (Tex.App.—Houston [14th Dist.] 1995, no writ).

liability.[35] Neither a taxing authority nor a taxpayer can circumvent the constitutional restrictions on, or requirements for, taxation merely by agreeing to settle a dispute. But by the same token, a fair settlement of a legitimate dispute that contemplates the market value of the property is not unconstitutional simply because it is not an appraisal and assessment done by standard procedure.[36] It was Bell's burden, as the movant for summary judgment, to establish the illegality of the arrangement, and it has failed to do so.

## IV

Three issues remain.

◼ First: the City contends that the School District has received all payments it is due. Neither party denies that beginning in 1966, Bell began making additional payments to the City that it did not share with the School District. But the City argues that Bell separately agreed to reimburse the City with these additional funds for the gross receipts payments it apportioned to the School District under Ordinance No.1933 so that it would receive the same amount of gross receipts payments that Bell paid other municipalities across the state. Because the City did not realize these additional funds as gross receipts payments under Ordinance No.1933, and Ordinance No.1935 limited the School District's right to apportionment to only those funds received under Ordinance No.1933, the City claims the School District is not entitled to any portion of the reimbursement payments.

The School District believes, for several reasons, that these additional payments from Bell can only be gross receipts payments that should have been apportioned pursuant to Ordinance No.1933. To begin with, the School District reasons that Ordinance Nos.1933 and 1935 are the City's sole sources of authority provided by the City Charter to accept any additional payments from Bell. Moreover, since 1978 Bell has passed through these additional payment costs to its customers under Ordinance No.1933, which is the only authority Bell has for passing through such payments to its customers under the terms of its General Exchange Tariff with the Texas Public Utilities Commission. And Bell has explained this to customers that have inquired about the additional charge. Additionally, the School District maintains that Bell never intended for the City to not apportion the payments, and that any description of the additional payments as "separate and apart" from the other apportioned payments was merely to clarify that Bell could cease making them at any time. Relying upon the text of Ordinance No.1935, the School District contends that the phrase "all of the funds realized from the gross receipts taxes under Ordinance No.1933" reflects the parties' intent to apportion all payments actually made by Bell that the City received. Alternatively, the School District asserts that this language in Ordinance No.1935 is ambiguous—it

**35.** Tex. Gov't Code § 2001.056(2) (granting administrative agencies the power to informally dispose of a contested case by agreed settlement); Tex. Tax Code §§ 111.101–03 (empowering comptrollers to settle tax disputes). *See, e.g., State v. Wiess,* 141 Tex. 303, 171 S.W.2d 848, 850–51 (1943); *Sharp v. AMSCO Steel Co.,* 893 S.W.2d 742, 744 (Tex.App.—Austin 1995, writ denied); *Nueces County v. Com Four,* 865 S.W.2d 538, 540 (Tex.App.—Corpus Christi 1993, no writ); *Hudspeth County Conservation & Reclamation Dist. No. 1 v. Spears & Co.,* 39 S.W.2d 94, 96 (Tex.Civ. App.—El Paso 1931, no writ); *Ostrum v. City of San Antonio,* 30 Tex.Civ.App. 462, 71 S.W. 304, 305 (1902, writ dism'd). Several statutes authorize settlement of taxes owed on particular goods or in specific circumstances. *See* Tex. Local Gov't Code § 324.099(j) (public park licenses, fees, and taxes); Tex. Tax Code §§ 154.411–.412 (seized cigarettes); § 155.151 (seized cigars and tobacco products); § 159.206 (seized controlled substances); § 191.1443 (attorney taxes); § 211.109 (inheritance taxes).

**36.** *Cf. State v. Richardson,* 126 Tex. 11, 84 S.W.2d 1076, 1078 (1935); *Dietrich v. Phipps,* 438 S.W.2d 900, 902 (Tex.Civ.App.—Houston [1st Dist.] 1969, no writ) (both finding that taxes that were arbitrarily determined were unconstitutional).

could either refer to all payments Bell made to the City or could be limited to only those funds earmarked under the original agreement—and thus summary judgment is improper because the interpretation of the instrument is a fact question for the jury.

The record clearly reflects factual disputes over this issue that preclude summary judgment. Reasonable minds could differ as to whether the City fulfilled its obligations under Ordinance No.1935. Accordingly, we remand this issue to the trial court.

■ Second: the City contends that the School District's claim that the City failed to monitor Bell's payments and discover deficits is barred by immunity. We agree and affirm the summary judgment in part as to this issue.

■ Tax collecting by a city is undeniably a governmental function.[37] As such, any liability for wrongs committed by city officials in performing that function cannot be enforced against the city.[38] Thus, even if the City was negligent in monitoring Bell's payments, the School District is barred from any recovery as the City is immune from liability. We affirm the City's summary judgment in part on the School District's 'failure-to-monitor' claim.

■ Third: the School District contends that the City Manager's 1992 letter is an enforceable agreement requiring the

City to apportion with the School District funds collected from Bell under Ordinance No. 11163. The City argues that the letter represents an unenforceable agreement to agree and that the city manager lacked the authority to bind the City in such an agreement.

The City Manager's letter provides in pertinent part: "If the City should negotiate a new agreement with [Bell], we commit the City to arriving at an appropriate arrangement with the FWISD to share in that revenue." The School District's representative signed the letter in acceptance of the City's offer. Based on the letter's language, we find it to be an agreement to make a future contract.

■ In general, a contract is legally binding only if its terms are sufficiently definite to enable a court to understand the parties' obligations.[39] "The rules regarding indefiniteness of material terms of a contract are based on the concept that a party cannot accept an offer so as to form a contract unless the terms of that contract are reasonably certain."[40] But an agreement to make a future contract is enforceable only if it is "specific as to all essential terms, and no terms of the proposed agreement may be left to future negotiations."[41] It is well settled law that when an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree.[42]

**37.** *See Black v. Baker,* 130 Tex. 454, 111 S.W.2d 706, 708 (1938); *City of Houston v. First City,* 827 S.W.2d 462, 480 (Tex.App.—Houston [1st Dist.] 1992, writ denied).

**38.** *See City of LaPorte v. Barfield,* 898 S.W.2d 288, 291 (Tex.1995); *Black,* 111 S.W.2d at 708.

**39.** *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex.1992).

**40.** *Texas Oil Co. v. Tenneco Inc.,* 917 S.W.2d 826, 830 (Tex.App.—Houston [14th Dist.] 1994)(citing RESTATEMENT (SECOND) OF CONTRACTS § 33(1) (1981)), *rev'd on other grounds,* 958 S.W.2d 178 (Tex.1997).

**41.** *Foster v. Wagner,* 343 S.W.2d 914, 920–21 (Tex.Civ.App.—El Paso 1961, writ ref'd n.r.e.). *Accord Tenneco,* 917 S.W.2d at 830–31; *Texas State Optical v. Caylor,* 387 S.W.2d 461, 464 (Tex.Civ.App.—Beaumont 1965, writ ref'd n.r.e.).

**42.** *Pine v. Gibraltar Sav. Ass'n,* 519 S.W.2d 238, 244 (Tex.Civ.App.—Houston [1st Dist.] 1974, writ ref'd n.r.e.) (citing *O'Neil v. Powell,* 470 S.W.2d 775, 779 (Tex.Civ.App.—Fort Worth 1971, writ ref'd n.r.e.); *Gasperson v. Madill Nat'l Bank,* 455 S.W.2d 381, 387 (Tex. Civ.App.—Fort Worth 1970, writ ref'd n.r.e.)). *See also Central Texas Micrographics v. Leal,* 908 S.W.2d 292, 297 (Tex.App.—San Antonio

Noticeably absent from the 1992 letter agreement is any indication of the amount or percentage of the newly negotiated payment that the City would apportion with the School District. The School District suggests that implied in this agreement was that the City would apportion the payment with it on the same basis as the City had for the previous fifty years—in accordance with their respective ad valorem tax rates. But a number of factors convince us of the contrary.

First, because the City and Bell had not negotiated a contract at the time the City and the School District agreed to this future contract, neither party knew the basis for the calculation, much less the amount the City would ultimately receive from Bell. Moreover, the record reveals that the City suffered from financial straits at the time—which the School District was aware of—and it wanted to retain as much of the payment as it could. The City's financial woes were, after all, part of the impetus for negotiating a new arrangement with Bell. Certainly it is not unreasonable to suggest that had the City agreed to apportion payments received under Ordinance No. 11163 with the School District, the City would have tried to decrease the School District's share compared to the prior agreement. Furthermore, both the City and the School District had concerns about the effect that County Education Districts, which operated as a separate ad valorem taxing authority in each county beginning in 1991, had on the School District's tax rate used for apportioning Bell's gross receipt payment under Ordinance No.1935. In fact the letter agreement referenced this concern and prospective changes, and proposed an interim agreement. Considering all of the uncertainty surrounding the extant apportionment scheme, the City's financial strife, and the City's negotiations with Bell, we find it virtually impossible that the parties

reached a meeting of the minds as to the amount or percentage the School District would receive.

Because this agreement for a future contract lacked the essential term of the amount or percentage the School District would receive, it is unenforceable and we need not address the City's claim that the city manager lacked the authority to bind it in such an agreement. We affirm in part the summary judgment for the City as to the School District's claim to payment under the 1992 letter agreement. Because this does not dispose of the School District's claims related to Bell's payments to the City under Ordinance No.1933 and the City's payment to the School District under Ordinance No.1935, we do not affirm the summary judgment in its entirety.

* * * * *

The court of appeals' judgment is affirmed to the extent that it affirms summary judgment for the City and Bell on the School District's claim that the City breached an agreement to continue their arrangement after 1992 and to monitor Bell's payments made under Ordinance No.1933. In all other respects the court of appeals' judgment is reversed. The case is remanded to the trial court for further proceedings.

1995, no writ) ("[T]he general rule is that no enforceable contract exists 'where the agreement of the parties leaves an essential term for later determination *and it is never deter-* *mined.'* ") (quoting *Mooney v. Ingram,* 547 S.W.2d 314, 317 (Tex.Civ.App.—Dallas 1977, writ ref'd n.r.e.) (emphasis added)).